UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JOHN J. LOONTJENS,

    Plaintiff,

v.

SENTRY INSURANCE A MUTUAL COMPANY,

    Involuntary Plaintiff,

ACE AMERICAN INSURANCE COMPANY,
GHP GROUP, INC.,
ABC INSURANCE COMPANY, and
WW GRAINGER, INC.,

    Defendants.

Case No. 13-CV-1217-JPS

ORDER

---

    The plaintiff, John Loontjens initiated this suit on August 28, 2013, in the Circuit Court of Milwaukee County, Wisconsin. On October 30, 2013, the defendants, ACE American Insurance Company "(ACE American"), GHP Group Inc. ("GHP"), ABC Insurance Company "(ABC Insurance"), and WW Grainger Inc., removed the suit to the United States District Court for the Eastern District of Wisconsin. (Docket #1). The plaintiff asserts both negligence and strict liability claims against defendants for a range of alleged deficiencies in the design, warnings, and instructions associated with a Dayton brand portable heater. (Docket #2, ¶¶ 13–30). The defendants filed a Motion to Exclude the plaintiff's sole liability expert along with a Motion for Summary Judgment. (Docket #23). The parties have fully briefed those motions (Docket #24, #25, #27, #29, #30, #34).The Court thus turns to resolve the motions, first recounting the pertinent facts and then resolving the

Motion to Exclude the plaintiff's sole liability expert before addressing the defendants' Motion for Summary Judgment.

1.   FACTUAL BACKGROUND

Plaintiff's lawsuit arises from an accident that occurred on September 20, 2010. The plaintiff was attempting to troubleshoot a leak in a small tire that a co-worker had given him from a Dayton brand portable "torpedo" heater, model 3VE53E, as part of his job as a tire mechanic for Miller Compressing Company. The 3VE53E Dayton "torpedo" heater in question was manufactured for defendant GHP in South Korea. The Dayton brand of "torpedo" heaters is a brand name specifically manufactured for the Dayton Manufacturing Company, a wholly owned subsidiary of defendant W.W. Grainger, Inc. The Dayton brand of "torpedo" heaters was assembled, packaged, and shipped directly to defendant W.W. Grainger's distribution center from South Korea. W.W. Grainger resold the pre-packaged Dayton brand "torpedo" heaters it received from GHP without altering the product. The heaters were then resold by defendant W.W. Grainger through its website and/or print catalog to any individual or business.

On January 15, 2009, plaintiff's employer, Miller Compressing Company, purchased the subject Dayton 3VE53E heater from defendant W.W. Grainger, Inc. The plaintiff testified that prior to September 20, 2010, he was never asked to work on a tire at Miller Compressing like the tire in question.

On the day of the injury, the plaintiff was given two heater tires to repair, one did not hold any air and the other one leaked. The actual maximum inflation pressure for the tire was 25 PSI. The plaintiff put an unknown quantity of air at an unknown pressure into the tire that leaked. Many of the specific facts related to the injury are disputed by the parties.

The plaintiff testified that he only partially inflated the tire so that he could put it into the dunk tank to check for leaks, however, the defendants assert that this is a false statement. After putting some air into the tire, the tire assembly exploded and hurled one of the metal split rims into the air, which struck the left side of the plaintiff's head, threw him backwards into some tires, and caused the loss of his left eye and other injuries. The force of the impact shattered the left side of the plaintiff's safety glasses and punched a large fist hole in his hard hat.

The plaintiff's expert, Dr. Burck, has opined that the catastrophic nature of the failure mode could have been prevented by: using larger nuts and bolts; using larger washers or rectangular ones; using thicker metal in the tire rims; using singular-piece rims; using semi-pneumatic tires; or using pressure relief valve stems. (LaFave Ex. I). The defendants contend that these opinions are unreliable and inadmissable under Fed. R. Evid. 104(a) and 702.

2.  MOTION TO EXCLUDE EXPERT EVIDENCE

Defendants move to exclude the proposed testimony of Dr. Burck, the plaintiff's sole liability expert, under Federal Rule of Evidence 702 and *Daubert*. The plaintiff intends to use Dr. Burck as a qualified expert in mechanical engineering, metallurgy, and failure analysis. The defendants argue that Dr. Burck should be precluded from testifying about wheel assembly design and servicing related issues because he is not qualified to address them as well as the fact that his methodology is unreliable. The plaintiffs argue that Dr. Burck is eminently qualified to render his metallurgy opinions regarding the defective split-rim tire assembly and that his methodology is reliable under *Daubert*. After much consideration, the Court must deny the defendants' Motion to Exclude the expert testimony of Dr. Burck.

As an initial matter, the Court denies the plaintiff's Motion to Strike the hearsay evidence advanced by the defendants in their challenge to Dr. Burck's competency. In testing the admissibility of expert testimony, the court applies the standards of Fed. R. Evid. 702 in conjunction with Fed. R. Evid. 104(a). *Lewis v. Citgo Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir 2009). In assessing whether Dr. Burck's testimony is permitted as an expert, the court is obliged to examine a variety of foundational matters that the jury would never be expected to see, or would encounter in a different context at trial.

2.1   Legal Standard

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and subsequent cases, the Supreme Court has charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, whether scientific or otherwise. See *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Federal Rule of Evidence 702 and *Daubert*, govern the admission of expert testimony. Rule 702 states:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

In order to make such an evaluation, the court must analyze the proposed testimony using a three-step analysis. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007).

First, "the witness must be qualified 'as an expert by knowledge, skill experience, training, or education.'" *Id.* An expert need not have particular academic credentials to be "qualified," but rather "anyone with relevant expertise enabling him [or her] to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000). Ultimately, "whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990). In other words, the focus is not on whether the "expert is qualified in general, but whether his or her 'qualifications provide a foundation for [him or her] to answer a specific question.'" *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (internal citations omitted).

However, even if the court finds that a witness is a "supremely qualified expert," that witness "cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable...." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n. 5 (7th Cir. 1999). Accordingly, at the second step of its analysis of whether expert testimony ought be admitted as evidence, the court must determine that an "expert's reasoning or methodologies underlying the testimony" are "scientifically reliable." *Ervin*, 492 F.3d at 904. Daubert provided a non-exhaustive list of "guideposts" for the court to consult in assessing the reliability of expert testimony: (1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the theory's known or potential error rate when applied; and (4) whether the theory has been generally accepted in the relevant scientific,

technical, or professional community. Additionally, other factors may apply. The Seventh Circuit, parroting the Advisory Committee Notes to Rule 702, has suggested other benchmarks for gauging expert reliability, including: (5) whether "maintenance standards and controls" exist; (6) whether the testimony relates to "matters growing naturally and directly out of research they have conducted independent of the litigation," or developed "expressly for purposes of testifying"; (7) "whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (8) "whether the expert has adequately accounted for obvious alternative explanations"; (9) "whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting"; and (10) "whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." *Fuesting v. Zimmer, Inc. (Fuesting I)*, 421 F.3d 528, 534–35 (7th Cir. 2005), vacated in part on other grounds, 448 F.3d 936 (7th Cir. 2006). *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786. "[T]he Daubert framework when assessing the reliability of an expert's testimony is a flexible one that must be adapted to the particular circumstances of the case and the type of testimony being proffered." *See Mihailovich v. Laatsch*, 359 F.3d 892, 919 (7th Cir. 2004); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (holding that, in applying the Daubert framework, a court must "account for the various types of potentially appropriate expert testimony.") Ultimately, the object of the court's Rule 702 reliability inquiry is to ensure that the opinions expressed by testifying experts "adhere to the same standards of intellectual rigor that are demanded in their professional work." *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996).

Third, a court must confirm that an expert's testimony is relevant; that is, the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin*, 492 F.3d at 904. Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Daubert*, 509 U.S. at 587, 113 S.Ct. 2786 (citing Fed.R.Evid. 401). The proponent of the expert's testimony bears the burden of proof with respect to whether the admissibility requirements are met. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). With these legal principles in mind, the court proceeds to examine the proposed testimony of Dr. Burck, who is the subject of the *Daubert* motion.

2.2 Analysis

First, the court examines whether Dr. Burck is qualified to testify on the issues that his testimony concerns. *See Gayton*, 593 F.3d at 617 ("[W]e must look at each of the conclusions [the expert] draws individually to see if he [or she] has the adequate education, skill, and training to reach them."). Dr. Burck has reached the following conclusions in this matter: 1) as manufactured, distributed, and sold, the accident heater was defective and unreasonably dangerous and not reasonably safe for its intended use because of the catastrophic mode of the wheels at inflation pressures which should have been anticipated; 2) contributing factors to the subject wheel failure were the thin sheet metal construction of the wheel, the small bolt head diameter, and the small thin washer used under the bolt heads, all of which allowed the material surrounding the bolt heads to deform and the heads to pull through; 3) the foreseeable catastrophic failure mode could have been eliminated at a nominal cost, which would have prevented or greatly

reduced the injuries to the plaintiff; 4) the catastrophic nature of the failure mode of the wheel when overinflated could have been prevented by reinforcing the material near the bolt holes by the use of washers to distribute the load, as is done by other manufacturers; and 5) the potential for over inflation of the heater tires should have been anticipated by the manufacturer, distributor, and seller of the heater.

### 2.2.1 Dr. Burck's Qualifications

Dr. Burck's academic record indicates that he holds a Bachelor of Science in Mechanical Engineering from Michigan State University, a Master of Science in Engineering Mechanics from Rensselaer Polytechnic Institute, and a Doctorate in Materials Science and Engineering from Northwestern University. Dr. Burck has worked as a consultant in the fields of metallurgical, materials, and mechanical failure analysis from 1984 to the present. Additionally, Dr. Burck's experience includes numerous seminar presentations, talks, and peer-reviewed publications, primarily on the topics of fatigue, fracture, and failure analysis of engineering materials. (McCormick Ex. 14).

Here, the court concludes that Dr. Burck is qualified to relate his opinion on the mechanics, qualities, and failure of the split-rim assembly at issue in this matter based on his education and work experience. The defendants' main objection to Dr. Burck's testimony is that a metallurgist is not an expert that "fits" the facts of this case. Defendants argue that Dr. Burck's lack of training, experience, or expertise related to tire or tire repair disqualifies his testimony in this case. However, nothing in Rule 702 or in the jurisprudence interpreting the rule indicates that an expert must have specific knowledge about the precise object of the litigation. *See Baumholser v. Amax Coal Co.*, 630 F.2d 550, 551 (7th Cir. 1980) ("The fact that [the expert] had little

actual experience in the study of blasts from coal mining operations[, the specific issue in the litigation,] did not disqualify him from expressing his opinion, which was based on general geological principles."); *see also Tormenia v. First Investors Realty Co.*, 251 F.3d 128, 135 (3d Cir. 2000) ("Rule 702 does not require that experts have personal experience with the object of the litigation in which they testify, nor does it require that experts eschew reliance on a plaintiff's account of factual events that the experts themselves did not observe.") In fact, the essence of expert testimony is calling a person to testify who has a knowledge base superior to a lay person in a "general theory or technique" and having that person "apply…the theory or technique to the specific facts of the case." Kenneth S. Broun, McCormick on Evidence § 13 (6th ed. 2006) ("[T]he expert's testimony is a syllogism: the major premise is the validity of the general theory or technique, the minor premise is the case specific data, and the application of major to minor yields a conclusion relevant to the merits of the case.").

Dr. Burck's opinions relate directly to the design of the split-rim wheel assembly at issue in this case. While Dr. Burck may not be the most qualified person to testify on the issue before the court, the Federal Rules of Evidence to do not require such a standard. Any disputes regarding Dr. Burck's qualifications can be the subject of cross-examination should he testify at trial. *See* G. Joseph & S. Saltzburg, Evidence in America § 51.3 (Courts have made it clear that "trial judges are not to demand that the proffered expert possess the highest possible credentials or skills, or be the most qualified of all conceivable experts.").

### 2.2.2 Reliability of Dr. Burck's Methodology

"'Even if an expert is qualified,'" a court should not allow an expert to offer an opinion that does not "rely on proper methodologies" and is

"'therefore speculative.'" *Lemmermann v. Blue Cross Blue Shield of Wis.*, 713 F. Supp. 2d 791, 801 (E.D. Wis. 2010) (citing *Weir v. Crown Equip. Corp.,* 217 F.3d 453 464 (7th Cir. 2000)). Accordingly, the court must examine the methodologies that the instant witness used in arriving at the conclusion that the subject heater was unreasonably dangerous. In making such an examination, the court keeps in mind the list of relevant factors provided by the *Daubert* case and its progeny discussed earlier in the order in evaluating the reliability of an expert's methods.

Here, the court finds that Dr. Burck's methodology is scientifically reliable under *Daubert* and, thus, the defendants' Motion to Exclude his testimony should be denied. Dr. Burck's investigation in this matter included: 1) a visit to Miller Compressing where he met with personnel regarding incident and examined the failed wheel and tire components as well as the other tire from the opposite side of the heater; 2) reviewing photographs of the accident site taken by Miller Compressing personnel immediately after the incident and also photographs and a report prepared by an insurance investigator nine days after the accident; 3) destructive failure testing (with metallurgist Dr. Gerald Zaminsk) to determine the inflation pressures required to fail the two exemplar wheel assemblies supplied by counsel for the defendants; 4) Dr. Burck investigated, tested and analyzed the sheet metal used in the split-rim tire assembly, the sheet metal used in the split-rim tire assembly, the nuts and bolts used to secure the split-rim tire assembly, the size of the bolt heads used to secure the split-rim tire assembly and their respective thread diameter and thread pinch, the washers used in the split-rim assembly, and the size of the bolt holes in the split-rim tire assembly as compared to the industry standards; and 5) proposing a destructive test protocol for the subject split-rim tire assembly to test the strength of the steel

split rim, however, the defendants refused to allow this testing to proceed. (LaFave Ex. J). Contrary to the defendants' assertions, this extensive list of testing cannot be considered mere conjecture or "bottom line" conclusion. Dr. Burck's testimony will assist the trier of fact to understand the evidence and to determine material facts at issue in this case. *See Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir. 2007).

The methodology used by Dr. Burck is vastly different from the cases defendants cite where courts have found expert testimony unreliable and therefore inadmissable. *Clark v. Takata Corporation* involved a vehicle rollover accident in which the plaintiff claimed that the failure of his seat belt caused him to suffer serious injuries. *Clark v. Takata Corp.*, 192 F.3d 750 (7th Cir. 1999). The court excluded the expert testimony of a biomechanical engineer who had performed absolutely no testing on the seat belt at issue or any re-enactment of the accident and had reviewed no testimony from the plaintiff or from any of the witnesses at the scene or any of the passengers who were in the accident vehicle. *Id.* at 755, 758. Furthermore, the expert witness in Clark had not made any measurements, such as "how far the front seat was reclined at the time of the accident or the extent to which the roof was crushed in the rollover." *Id.* at 755-56. In giving his opinion, the expert witness simply stated that he had relied on his "experience." *Id.* at 758. Under those facts, the court found the expert's testimony unreliable and properly excluded. *Id.* at 759.

Likewise, in *Lemmermann v. Blue Cross Blue Shield,* the court excluded two of the plaintiff's expert witnesses whose testimony it deemed unreliable under *Daubert.* 713 F.Supp.2d 791 (2010). In *Lemmermann,* the plaintiff claimed that she suffered injuries when chemicals she was using to treat her pool exploded, causing her to suffer from respiratory injuries. *Id.* at 793. She retained an

environmental engineering expert to bolster her claim. *Id.* at 798. The expert was to testify regarding two distinct claims: (1) the product could explode when mixed with a small amount of water; and, (2) the manufacturer failed to provide an explosion warning. *Id.* The court ultimately found that the expert was qualified to testify to the first claim, but excluded his testimony regarding the second claim because he lacked "expertise in a manufacturer's responsibilities to the end users of their products." *Id.* at 800-01. The court ultimately struck the expert engineer's testimony entirely because it found his methodology unreliable. *Id.* at 801. In reaching this conclusion, the court stated the following:

> In essence, Mr. Schuck's "methodology" involved reading several labels and data sheets regarding dichlor and, at best, parroting the conclusions of the authors of those data sheets. Surmising that a chemical reaction will occur because someone else has concluded that a chemical reaction will occur is utterly circular in its logic and is the epitome of an unreliable methodology.

*Id.* at 802. In addition to striking the testimony of the plaintiff's environmental engineering expert, the court also concluded that the expert testimony of the plaintiff's treating pulmonologist was unreliable and therefore excluded. *Id.* at 807. The plaintiff in *Lemmermann* suffered from preexisting asthma. *Id.* at 805. The pulmonologist was going to offer testimony that the plaintiff either acquired Reactive Airways Dysfunction Syndrome (RADS) or suffered an exacerbation of her asthma. *Id.* at 803. Among other things, the court was troubled by the fact that the first criterion for the diagnosis of RADS is "the absence of preexisting disorder, asthma symptomatology or history of asthma in remission, and exclusion of conditions that can simulate asthma," yet the plaintiff suffered from an obvious history of battling asthma. *Id.* at 805. Moreover, the court noted that

the "fourth criterion for a valid diagnosis of RADS is the onset of asthma symptoms within minutes to hours, and less than 24 hours after the exposure." *Id.* Yet the court noted that the plaintiff had not complained about shortness of breath on the day of the incident and the records showed her lungs to be free and clear of injury. *Id.* Regarding the diagnosis of exacerbation of preexisting asthma, the court found it unreliable because the only time the expert witness referred to it was at the end of her sworn deposition. *Id.* at 806. In addition to regarding the expert pulmonologist's diagnosis as suspect, the court further found that her methodology regarding causation was suspect. *Id.* at 809. Again, this finding went to the fact that the expert had not investigated to what extent the plaintiff had been exposed to the chemical or even "undertaken any effort to explain her findings regarding causation." *Id.*

In contrast to the cases cited by defendants, here, Dr. Burck conducted numerous tests, as detailed above, in relation to the incident at hand. Rather than engaging in a *Daubert* analysis using any of the factors to determine reliability, the defendants point to a variety of additional tests that Dr. Burck should have performed in order to reach a reliable conclusion in this matter. Defendants argue that Dr. Burck failed to consider whether what the plaintiff relates about the accident is physically possible. Defendants further argue that Dr. Burck failed to consider how fast the tire in question would have failed if exposed, even briefly, to line pressure of 130 PSI—the amount of pressure defendants allege was used in the accident.

Indeed, there is no doubt that additional testing may have been helpful in reaching a scientific conclusion in this case. However, it is not the purview of the court as the gatekeeper of evidence to determine the necessity of each and every possible test that could possibly be performed in reaching

a valid scientific conclusion. Such determination is better left as the subject of cross-examination. Moreover, Dr. Burck requested additional testing related to destructive testing protocol in this case that the defendants refused to allow. (LaFav Ex. H). Defendants have not pointed to any information that suggests that Dr. Burck used a scientific theory that is untested, not subject to peer review, not evaluated in light of potential error rates, or not accepted in the relevant scientific community. The defendants can more appropriately attack Dr. Burck's inclusion or exclusion of certain possibilities upon cross-examination at trial. As the Supreme Court noted in *Daubert*,

> Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence…. Additionally, in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment…and likewise to grant summary judgment.

*Daubert*, 509 U.S. at 596. Accordingly, the defendants' Motion to Exclude Dr. Burck as a liability expert is denied.

3. MOTION FOR SUMMARY JUDGMENT

The court now turns to the defendants' Motion for Summary Judgment. The plaintiff alleges that while he inflated one of the tires of the torpedo heater, the rim exploded and smashed into the left side of his face, which caused serious bodily injury. (Compl. at 5). Plaintiff seeks recovery under negligence and/or strict liability in tort.[1]

---

[1] The Plaintiff additionally makes a third claim for punitive damages, which the court shall discuss in detail below.

### 3.1 Legal Standard

Summary judgment is appropriate where the "pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Wis. Alumni Research Found. v. Xenon Pharms.*, Inc., 591 F.3d 876, 882 (7th Cir. 2010). A genuine issue of material fact exists when a reasonable jury could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The initial burden is on the moving party…to demonstrate that there is no material question of fact with respect to an essential element of the non-moving party's case." *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.* 554 F.3d 1133, 1137 (7th Cir. 2009) (quoting *Cody v. Harris*, 409 F.3d 853, 860 (7th Cir. 2005)). Once the movant satisfies this initial burden, the burden then shifts to the non-moving party who "may not rest upon the mere allegations or denials of his pleading, but…must set forth specific facts showing that there is a genuine issue for trial." *Doe v. Cunningham*, 30 F.3d 879, 883 (7th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). In ruling on a summary judgment motion, the court must view the evidence plus all inferences reasonably drawn from the evidence in the light most favorable to the non-moving party. *TAS Distributing Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 630 (7th Cir. 2007). With these standards in mind, the court looks to the specific allegations made by the plaintiff.

### 3.2 Analysis

Defendants make three separate arguments in their Motion for Summary Judgment. The Court will address each of the arguments in turn. First, the defendants argue that they are entitled to summary judgment on

the assumption that the plaintiff's expert, Dr. Burck, will be excluded in this matter. As discussed above, the court finds that Dr. Burck is qualified to testify regarding his conclusions in this matter. What remains is a duel of the experts, whose ultimate conclusions present an issue of material fact that is within the province of the jury. Thus, the defendants are not entitled to summary judgment under this theory.

Second, the defendants argue that the plaintiff cannot prove any deficiencies in the warnings or instructions to the subject wheel assembly nor that they caused his accident. Defendants correctly note that the plaintiff has not disclosed any expert to address the warnings and instructions regarding the subject wheel assembly. Indeed, the plaintiff's sole expert, Dr. Burck, stated he had no opinion on the issue. The defendants argue that any failure to warn allegations must be dismissed because the concept of what constitutes appropriate instructions or warnings for this component of heater is beyond the ken of average jurors. *See Weis v. United Fire and Cas. Co.*, 197 Wis.2d 365, 380-81, 541 N.W.2d 753 (1995) (holding that "[t]he lack of expert testimony in cases which are so complex or technical that a jury would be speculating without the assistance of expert testimony constitutes an insufficiency of proof.") The defendants further argue that, regardless, the plaintiff cannot prove causation for a failure to warn claim because the plaintiff's testimony indisputably proves that he required no warning about the hazards of overinflating a tire

The court finds that the defendants are not entitled to summary judgment on the failure to warn claim. The defendants have cited to no cases that require an expert specifically on the issue of proper instructions or warnings. Although the plaintiff has no expert on this subject, the issue of the defendants' negligence remains within the purview of the jury. Moreover,

the fact that the plaintiff did not check the tire pressure in this case does not disprove the possibility that he may have altered his behavior and avoided injury with a different type of warning. The court finds that material issues of fact exist as to any failure to warn claim and, thus, the defendants are not entitled to summary judgment on the claim.

Finally, the defendants claim that the plaintiff improperly plead punitive damages as a separate claim. The defendants properly note that "[p]unitive damages are a remedy, not a cause of action." Hansen v. Tex. Roadhouse, Inc., 2013 WI App 2 ¶ 21, 345 Wis. 2d 669, 827 N.W. 2d 99 (Ct. App. 2012). As such, the court will dismiss the plaintiff's third claim for punitive damages and will consider the claim as a remedy for the remaining negligence and strict liability claims.

4. CONCLUSION

The Court finds that the plaintiff's expert, Dr. Burck, is permitted to testify as an expert witness in this matter under *Daubert.* As such, material issues of fact remain that preclude summary judgment at this stage. Finally, in light of these rulings, the Court has considered the parties' Joint Motion to Adjourn Trial (Docket 38), and finds that staying all pretrial proceedings is no longer necessary.[2]

Accordingly,

---

[2] The Court notes that the parties have not fully briefed the issues related to the defendants' expert, Dr. Bolden's, testimony. The plaintiff argues in the opposition brief that portions of Mr. Bolden's report/opinions should be stricken as inherently reliable under *Daubert.* In the interest of efficiency and timely ruling on the Motion for Summary Judgment, the court will consider arguments related to Mr. Bolden's expert opinions in motions *in limine* prior to the start of trial.

IT IS HEREBY ORDERED that the defendants' Motion to Exclude Plaintiff's Sole Liability Expert, Dr. Burck (Docket #23), be and the same is hereby DENIED;

IT IS FURTHER ORDERED that the defendants' Motion for Summary Judgment (Docket #23) be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that the Joint Motion to Adjourn Trial and Stay Proceedings (Docket #38) be and the same is hereby DENIED.

Dated at Milwaukee, Wisconsin, this 15th day of October, 2014.

BY THE COURT:

*[signature]*

J.P. Stadtmueller
U.S. District Judge